## UNITED STATES DISTRICT COURT
## DISTRICT OF SOUTH CAROLINA
## FLORENCE DIVISION

| | | |
|---|---|---|
| Kimberly Taylor, | ) | Civil Action No.:_____ |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **COMPLAINT** |
| | ) | **JURY TRIAL DEMANDED** |
| Comcast Corporation, Comcast Cable | ) | |
| Communications Management, LLC, | ) | |
| d/b/a Xfinity Mobile, and | ) | |
| The CCS Companies d/b/a | ) | |
| Credit Collection Services | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## COMPLAINT

1.      This is an action brought by Plaintiff, Kimberly Taylor, for actual and statutory damages, attorneys' fees, and costs for Defendant The CCS Companies d/b/a Credit Collection Services, Inc.'s (hereinafter "CCS") violations of the Fair Debt Collection Practices Act, 15 U.S.C. §1692, *et* seq (hereinafter "FDCPA"), actual, statutory and punitive damages, attorneys' fees, and costs for Defendants' violations of the Fair Credit Reporting Act, 15 U.S.C. § 1681 et seq, (hereinafter "FCRA"), and compensatory and punitive damages for the Defendants' violations of the South Carolina common law set forth herein.

2.      The FCRA exists to protect consumers' privacy and to impose upon those who trade in consumers' private information strict requirements to ensure that the information they report is as accurate as possible.

1

3.     Before the enactment of the FCRA, inaccurate and misleading information was identified as "the most serious problem in the credit reporting industry." 115 Cong. Rec. 2411 (Jan. 31, 1969). With this problem in mind, Congress enacted the FCRA "to prevent consumers from being unjustly damaged because of inaccurate or arbitrary information in a credit report." S. Rep. No. 91-517 (1969).

4.     The preservation of one's good name and reputation is also at the heart of the FCRA's purposes:

> [W]ith the trend toward computerization of billings and the establishment of all sorts of computerized data banks, the individual is in great danger of having his life and character reduced to impersonal "blips" and key-punch holes in a stolid and unthinking machine which can literally ruin his reputation without cause, and make him unemployable or uninsurable, as well as *deny him the opportunity to obtain a mortgage or buy a home. We are not nearly as much concerned over the possible mistaken turn-down of a consumer for a luxury item as we are over the possible destruction of his good name without his knowledge and without reason. * * * [A]s Shakespeare said, the loss of one's good name is beyond price and makes one poor indeed* (emphasis added).

*Bryant v. TRW, Inc.*, 689 F.2d 72, 79 (6th Cir. 1982) [quoting 116 Cong. Rec. 36570 (1970)].

## JURISDICTION AND VENUE

5.     This Court has Jurisdiction under the FCRA, 15 U.S.C. §1681p, FDCPA, 15 U.S.C. §1692k(d) and 28 U.S.C. §1331 and §1332.

6.     Venue is proper in the Florence Division because the Plaintiff resides in Darlington County and the Defendants transacted business throughout South Carolina and in this division.

## PARTIES

7.    Plaintiff, Kimberly Taylor, is a resident and citizen of the State of South Carolina, Darlington County, and is over the age of twenty-one (21) years.  Plaintiff is a consumer as that term is defined by the FCRA, 15 U.S.C. §1681a(c), and the FCDPA, 15. U.S.C. §1692a(3).

8.    Defendant Comcast Corporation ("Comcast") is a Pennsylvania corporation headquartered in Philadelphia.  Comcast may be served with process by way of its President and CEO, David Watson, at its corporate headquarters, 1701 John F. Kennedy Blvd., Philadelphia, PA 19103. In all respects and at all times relevant herein, Defendant was doing business in the State of South Carolina and in this division.

9.    Defendant Comcast Cable Communications Management, LLC ("Comcast Cable") is a Delaware corporation and a wholly owned subsidiary of Comcast Corporation. Comcast Cable may be served with process through its registered agent CT Corporation System, 2 Office Park Court, Suite 103, Columbia, South Carolina 29223.  In all respects and at all times relevant herein, Defendant was doing business in the State of South Carolina and in this division.

10.    Xfinity Mobile is a brand of Comcast Cable used to market Comcast Cable's consumer cable television, internet, telephone and wireless services.

11.    Defendant The CCS Companies d/b/a Credit Collection Services (hereinafter referred to as "CCS") is a Delaware corporation with its principal office located at 725 Canton Street, Norwood, MA 02062.  CCS may be served with process by way of its President, Steven Sands, at its principal office, 725 Canton St., Norwood, MA 02062.

Defendant CCS is a "debt collector" as that term is defined in 15 U. S. C. 1692a(6) and is regularly engaged in the collection of debts.  In all respects and at all times relevant herein, Defendant was doing business in the State of South Carolina and in this division.

12.    Defendants Comcast, Comcast Cable and CCS each participated in and contributed to the damages caused to the Plaintiff.  The Defendants all acted in concert with the others in the actions described below.

13.    All acts done by Defendants Comcast and Comcast Cable were done on their own behalf, on behalf of each other, and on the behalf of CCS.  Each Defendant acted as principal and agent, each for the others.

14.    All acts done by Defendant CCS were done on its own behalf and on the behalf of Comcast and Comcast Cable.

## **FACTUAL ALLEGATIONS**

15.    On or about November 27, 2021, Plaintiff Kimberly Taylor received a letter in the mail from CCS stating she owed $210.57 to Comcast Cable for account #8877702032253. Plaintiff did not have Comcast Cable and did not owe Comcast Cable any money.

16.    On or about November 27, 2021, the Plaintiff called Defendant CCS and spoke with a representative by the name of "Alba."  Plaintiff informed CCS that she did not have Comcast Cable and that it must be fraud.  Plaintiff was then told by CCS that the Comcast Cable account was in her name, but the service address was located at 823 Deer Hollow Drive in Sugar Land, Texas.  The Plaintiff did not and has never lived in Sugar Land, Texas. Additionally, the Plaintiff did not authorize anyone to open this account in her name.  The Plaintiff was also told during this phone call that she had an outstanding delinquent account

4

for Xfinity Mobile phone service for $1,277.47. The Plaintiff informed CCS that she had never had a Xfinity account. Alba instructed the Plaintiff to contact Comcast Cable's Fraud Department. This call with Alba lasted about 30 minutes.

17.    When the Plaintiff hung up from her call with Alba at CCS, she immediately contacted Comcast Cable's Fraud Department via phone. The Plaintiff was transferred to multiple people during the one-hour phone call, and she repeatedly informed each person she was transferred to that someone had fraudulently opened two accounts in her name. After Plaintiff made these calls to Defendants, Plaintiff began receiving repeated collection calls from CCS.

18.    On or about December 4, 2021, the Plaintiff called Comcast Cable's Fraud Department a second time because she had received another collection letter from CCS dated November 27, 2021. During this call, Comcast Cable continued to insist that the Plaintiff had two collection accounts. Plaintiff specifically informed Comcast Cable that neither of the accounts were her accounts. Ultimately, Plaintiff was told to go online to www.xfinity.com/I.D.theft to obtain a fraud claim form.

19.    On December 6, 2021, the Plaintiff filed a police report with the Darlington Police Department stating her personal information had been used without her consent to obtain services from Comcast Cable and Xfinity Mobile in Sugar Land, Texas.

20.    On or about February 4, 2022, the Plaintiff received a collection letter from CCS stating that she owed $1,277.47 to Xfinity Mobile for account #1005508538. The Plaintiff immediately contacted CCS via phone to alert them again that this was a fraudulent account. This call lasted approximately 20 minutes.

21.    On or about February 5, 2022, the Plaintiff emailed Comcast Cable's Fraud Department at CSA-IDT@comcast.com and attached her fraud claim form, a copy of her drivers' license, a copy of her and her husband's mortgage statement, and a copy of the police report she filed regarding the fraud.  Plaintiff's email provided Comcast Cable her cell phone number, her home phone number, and informed them that she was born in South Carolina and had lived in South Carolina her entire life.

22.    On or about February 25, 2022, the Plaintiff received another collection letter from CCS stating she owed $1,277.47 for Xfinity Mobile account #1005508538.  This letter specifically informed Plaintiff that she was past-due on "her" XfinityMobile account, which remained unpaid.

23.    Thereafter, Plaintiff called Comcast Cable's Fraud Department and it claimed it had not received Plaintiff's February 5, 2022, email, so on April 1, 2022, the Plaintiff forwarded her original February 5, 2022, email and all attachments to Comcast Cable.

24.    On or about April 18, 2022, the Plaintiff received a collection letter from CCS stating that she owed $1,277.47 for Xfinity Mobile account #1005508538 and offering her a 25% discount to resolve the past-due account.

25.    On or about April 28, 2022, the Plaintiff spoke with "Frank" in Comcast Cable's Fraud Department.  During this call, Comcast Cable again claimed it had never received Plaintiff's email with the Fraud Claim form.

26.    Accordingly, after that call, Plaintiff immediately forwarded her email to Comcast Cable's Fraud Department along with copies of her Fraud Claim form, a copy of her drivers' license and mortgage statement, and a copy of the police report she filed.  This was the

6

third time she emailed these documents to Comcast Cable.

27.    After again forwarding her email on April 28, 2022, the Plaintiff made a second call to Comcast Cable's Fraud Department and spoke with "Melvin."  During this call Melvin specifically admitted Comcast Cable had received Plaintiff's email and stated Comcast Cable would review her Fraud Claim form.

28.    On or about May 3, 2022, the Plaintiff called and spoke with "Tiffany" in Comcast Cable's Fraud Department. Although Plaintiff had already emailed Comcast Cable three times, none of those emails had been returned as undeliverable, and Comcast Cable admitted receiving the most recent email, Tiffany now claimed that Comcast Cable had not reviewed Plaintiff's Fraud Claim form because the attachments to Plaintiff's email were blank.

29.    Accordingly, on May 3, 2022, Plaintiff forwarded her email and all attachments to Comcast Cable's Fraud Department for the fourth time.

30.    After forwarding her email, Plaintiff placed a second call to Comcast Cable's Fraud Department on May 3, 2022, and spoke with a representative by the name of "Daniel." During this call, Comcast Cable claimed it could not read Plaintiff's SSN on her attachments.

31.    On May 4, 2022, Plaintiff sent a fifth email to Comcast Cable's Fraud Department and included all of the attachments, including a new copy of her Identity Theft Claim form.

32.    In Plaintiff's Comcast Identity Theft Claim Form, she granted Comcast Cable permission to contact her in connection with her Identity Theft Claim.  The Plaintiff provided her name, email address, residential address, her cell phone number, and her home

phone number.  The Plaintiff also checked the box stating that Comcast Cable could leave a message on an answering machine or with any party who answers the phone. The Plaintiff also provided general information, such as her date of birth, her social security number, her South Carolina Driver's License number, and the date she began living at her current address.  The Plaintiff stated she did not authorize anyone to use her name or her personal information, and that she did not know who used her information or identification documents.

33.     On or about May 6, 2022, the Plaintiff received a letter from Comcast Cable stating it had received an incomplete fraud packet and/or required additional information in order to process the Plaintiff's fraud claim.  Specifically, Comcast Cable stated that it needed the following items:  a completed Identity Theft Victim's Complaint and Affidavit form; proof of residency during the time the Comcast Cable services were under Plaintiff's name, such as lease agreements, utility bills, or mortgage statements in her name; and a copy of Plaintiff's valid government-issued photo identification card which could be a copy of her driver's license, state-issued ID card or her passport.

34.     On or about May 9, 2022, after receiving Comcast Cable's letter, the Plaintiff called Comcast Cable's Fraud Department and talked with "Fran." The Plaintiff informed Fran that she had already provided a copy of her Identity Theft Victim's Complaint and a copy of her driver's license.  She then asked if a copy of her mortgage monthly statement would be sufficient for proof of residency and Fran told her that proof of mortgage would suffice. This call lasted from 3:36 p.m. to 4:26 p.m.

35.     On May 9, 2022, Plaintiff provided the additional documentation via email and

followed up with two additional calls to Comcast Cable's Fraud Department to confirm her proof of mortgage was sufficient. Plaintiff was told that her submission was sufficient and that she would receive a response from Comcast Cable within 30 days. That same day, Plaintiff received an email from Xfinity Alerts thanking her for contacting the Comcast Customer Security Assurance team.

36.    After waiting 30 days and not hearing anything from Comcast Cable, the Plaintiff called the Comcast Cable Fraud Department for an update. During this call Comcast Cable's Fraud Department stated that it now needed utility bills for June, July, and August 2021. However, Plaintiff explained that she did not have copies of her old utility bills because once they were paid, they were discarded. Comcast Cable's Fraud Department then told Plaintiff it would accept copies of her bank statements for those same months to show proof of residency. At that point, Plaintiff refused to provide the bank statements as she had already been the victim of identity theft and had already provided everything else requested by Comcast Cable. Plaintiff then requested to speak with a supervisor. Plaintiff was told the supervisor was on another call but that she would receive a call back in five to ten minutes. Plaintiff waited and waited and waited, but never received a call back. To this day, Plaintiff has never received any calls from a supervisor with Comcast or Comcast Cable.

37.    On or about May 19, 2022, the Plaintiff received a collection letter from CCS stating she owed $210.57 for Comcast Cable account number 8777702032253945.

38.    On or about June 3, 2022, the Plaintiff received another letter from Comcast Cable which stated it had received an incomplete fraud packet and/or required additional

information in order to process her claim.  Comcast Cable stated that it needed the following items in order to process Plaintiff's fraud claim:  a completed Identity Theft Victim's Complaint and Affidavit form; proof of residency during the time the Comcast services were under Plaintiff's name, such as lease agreements, utility bills, or mortgage statements in her name; and a copy of Plaintiff's valid government-issued photo identification card which could be a copy of her driver's license, state-issued ID card or her passport.  As Plaintiff had already provided all of these items and confirmed receipt with Comcast Cable, she did not send the information in again.

39.    In addition to repeatedly sending Plaintiff collection letters to collect on two accounts Plaintiff had already informed Defendants were fraudulent, Defendant CCS also began reporting both accounts as collection accounts on Plaintiff's credit reports.  As a result of CCS' reporting of these two fraudulent accounts as collection accounts belonging to Plaintiff, Plaintiff's credit score with TransUnion dropped from 846 to 723.  Plaintiff's credit score with Equifax dropped from 866 to 744.  Plaintiff also had her credit limit with Lowe's lowered.

40.    On or about June 21, 2022, Plaintiff obtained a copy of her Equifax credit report online.  Upon review, Plaintiff learned that not only was CCS reporting both of the fraudulent accounts on her credit report as collection accounts, but the fraudulent address in Sugar Land, Texas used to open these fraudulent accounts had also been added as a former address on her Equifax credit report on June 7, 2022.   Plaintiff also learned that Comcast Cable Houston had obtained a copy of her Equifax credit report on July 16, 2021, without Plaintiff's authorization or permission.  That same day Comcast - Xfinity Mobile

10

also obtained a copy of her credit report for "utility purposes." Thereafter, on October 5, 2021, Comcast did an account review of Plaintiff's Equifax credit file. Each of these inquiries was without Plaintiff's authorization or permission. On the fraudulent collection accounts, CCS was reporting the Comcast Cable account as assigned on October 17, 2021, and the Xfinity Mobile account as assigned on November 3, 2021. Both accounts were reporting as updated by CCS on June 3, 2022, well after the Defendants were clearly notified by Plaintiff of the fraud.

41.    On or about June 21, 2022, Plaintiff also obtained a copy of her Trans Union credit report which included both fraudulent CCS collection accounts which were reporting as belonging to Plaintiff:  Credit Collection Service Acct #4485**** opened on October 17, 2021, and Credit Collection Service Acct #4547*** opened on November 3, 2021.

42.    On or about June 21, 2022, Plaintiff obtained a copy of her Experian credit report. Upon review, Plaintiff learned that not only was CCS reporting both of the fraudulent accounts on her Experian credit report as collection accounts, but the fraudulent address in Sugar Land, Texas used to open these fraudulent accounts had also been added as an address on her credit report.  CCS was reporting Acct #4485 as opened on October 17, 2021, and a charged off/collection history since February 2022.  CCS was reporting Acct #4547 as opened on November 3, 2021, and a charged off/collection history since March 2022.  On this account, CCS was also reporting the original creditor as "CCS for Comcast Cable -XM".  Finally, Plaintiff learned that Comcast Cable had reviewed some or all of her Experian credit file on July 16, 2021, without Plaintiff's authorization or permission.

43.    On or about June 30, 2022, Plaintiff sent a written dispute letter to Equifax via

certified mail.  In her letter ("First Equifax Dispute"), Plaintiff stated she had been the victim of identity theft and listed the CCS Accounts as having been fraudulently opened in her name.  Plaintiff also disputed the Sugar Land, Texas address as an address linked to at least one of the fraudulent accounts and stated that she has never lived anywhere but South Carolina.  Finally, Plaintiff disputed all three of the Comcast inquiries as fraudulent.  On or about July 6, 2022, Equifax received Plaintiff's First Equifax Dispute, and forwarded same to CCS.

44.     That same day, Plaintiff also sent a written dispute letter to TransUnion via certified mail ("First Trans Union Dispute").  In her letter to TransUnion, Plaintiff stated she had been the victim of identity theft and listed the CCS Accounts as having been fraudulently opened in her name. Plaintiff specifically requested TransUnion to delete Credit Collection Service Acct 448526** and Credit Collection Service Acct 454768**.  TransUnion received Plaintiff's First Trans Union Dispute and forwarded same to CCS.

45.     Plaintiff also sent a written dispute letter to Experian via certified mail ("First Experian Dispute").  In her letter to Experian, Plaintiff stated she had been the victim of identity theft and listed the CCS Accounts as having been fraudulently opened in her name. Plaintiff also disputed the Sugar Land, Texas address as an address linked to the fraudulent accounts and stated that she has never lived anywhere but South Carolina.  Finally, Plaintiff disputed the Comcast inquiry on her Experian credit file as fraudulent.  Experian received Plaintiff's First Experian Dispute on July 6, 2022, and forwarded same to CCS.

46.     On or about July 15, 2022, Plaintiff received the investigation results from Trans Union which stated that the CCS accounts had been deleted.  However, while the fraudulent

CCS accounts were reporting on Plaintiff's TransUnion credit file, Plaintiff's credit was viewed by Synchrony Bank, Bank of America, Synchrony/Lowes, Capital One, and Goldman Sachs Bank USA-General Motors.

47.    On or about July 29, 2022, Plaintiff received a letter from Equifax stating that the disputed address in Sugar Land Texas had been deleted.  Additionally, CCS account #2687 was deleted.  However, CCS account #6857 was not deleted, but instead, was still reporting as a collection account on Plaintiff's credit.

48.    On or about July 29, 2022, Plaintiff also received the Dispute Results from Experian wherein Experian stated that both CCS accounts had been deleted from her credit file. Additionally, the Comcast inquiry was also removed.  Plaintiff does not know the exact date the disputed CCS accounts were removed from her Experian credit file.  However, from November, 2021 through July, 2022, Plaintiff's Experian credit report was viewed by JPMCB, ECS/MCE Web Authentication, Social Security Administration, Bank of America, Capital One, The Goldmand Sachs Group, LexisNexis, Comenity Servicing LLC, ComenityCB/Overstock, and DL/Navy Federal Credit Union.

49.    On August 19, 2022, Plaintiff sent a second dispute letter to Equifax ("Second Equifax Dispute") wherein she again stated she had been the victim of identity theft and listed the CCS Collection with account number ending *6587 as a fraudulent account opened in her name without her permission.  Plaintiff requested Equifax to delete the CCS Collection Account with account number ending *6587 immediately. On or about August 25, 2022, Equifax received Plaintiff's Second Equifax Dispute and forwarded same to CCS.

50.    On or about August 31, 2022, Plaintiff received a letter from Equifax stating that

13

the disputed CCS account was not currently reporting on her Equifax credit file.

51.    Plaintiff does not know the actual date the disputed CCS account was finally removed from her Equifax credit report.  However, from November 2021, through August, 2022, Verizon, Citibank, Citi Cards CBNA, Comenity Capital Bank, United Trust Bank, SunTrust Mortgage, and Capital One all viewed Plaintiff's Equifax credit file.  During the time that each of these entities viewed Plaintiff's Equifax credit file, it wrongfully contained at least one, if not both, of the fraudulent CCS Collections accounts.

52.    From November 2021 through at least August 2022, Plaintiff received numerous collection calls from CCS.  These calls were made to Plaintiff multiple times per day and multiple days per week, despite clear notice that Plaintiff disputed the accounts as fraudulent.

<u>**COUNT ONE**</u>
**(Invasion of Privacy)**

53.    The Plaintiff adopts the averments and allegations of paragraphs 15 through 52 hereinbefore as if fully set forth herein.

54.    South Carolina state law recognizes the Plaintiff's right to be left alone and to be free from invasions of privacy in such a manner as to outage or cause serious mental suffering, shame, and humiliation to Plaintiff.  *See Swinton Creek Nursery v. Edisto farm Credit*, 334 S.C. 469, 477 (S.C. 1999).

55.    Defendants intentionally intruded upon the Plaintiff's right to privacy by continually harassing the Plaintiff with collections calls regarding two accounts that Defendants had notice were fraudulent, by sending the Plaintiff numerous collection letters informing her

that her accounts were past due and demanding payment, by repeatedly viewing Plaintiff's credit files, or parts thereof, without Plaintiff's authorization or permission, by refusing to delete/remove the fraudulent accounts and impermissible pulls of her credit reports from her credit reports, and by causing ongoing harm to Plaintiff's credit and reputation.

56.    The actions of Defendants were malicious, intentional, and repeated with such frequency that they were outrageous, caused Plaintiff serious mental suffering and invaded the Plaintiff's privacy by wrongfully intruding into Plaintiff's private activities.

57.    The conduct of Defendants in engaging in the systematic campaign of harassment as described herein demonstrates the Defendants' blatant and shocking disregard for Plaintiff's rights, and resulted in multiple invasions of privacy in such a way as would be considered highly offensive to a reasonable person.

58.    As a result of the intrusions and invasions into Plaintiff's privacy and placing Plaintiff in a false light, the Plaintiff is entitled to compensatory damages in an amount to be determined by a struck jury.

59.    Additionally, as all of the acts undertaken and performed by Defendants and their employees and/or agents were committed with malice, intent, wantonness, and recklessness, the Plaintiff is also entitled to punitive damages from Defendants in an amount to be determined by a struck jury.

## COUNT TWO
### (Defamation, Libel and Slander)

60.    The Plaintiff adopts the averments and allegations of paragraphs 15 through 59 hereinbefore as if fully set forth herein.

15

61.    Defendants willfully, wantonly, recklessly and/or maliciously published and communicated false and defamatory statements regarding Plaintiff to third parties and the public at large.  Said statements harmed Plaintiff's reputation and caused Plaintiff mental anguish and emotional distress.

62.    Said communications were false in that Plaintiff was not indebted to Defendants Comcast, Comcast Cable, or CCS.  Plaintiff did not owe any balance on the accounts that are the subject of this action as both were clearly fraudulent accounts.

63.    Said false and defamatory statements have harmed the reputation of Plaintiff and/or deterred third persons from associating with Plaintiff.  Specifically, Defendants referred the accounts to Defendant CCS who subsequently undertook to collect the accounts and reported said accounts as collection accounts on Plaintiff's credit files.  Plaintiff's credit files were viewed by numerous third parties and Plaintiff's credit limit with Lowe's was reduced.

64.    Defendants communicated to third parties and the public at large false information concerning Plaintiff, disseminating and imputing false and misleading credit worthiness information concerning Plaintiff, including but not limited to reporting that Plaintiff owed the debts that are the subject of this action.

65.    At the time said communications were made, Defendants knew or should have known the falsity of the communications or recklessly disregarded the potential inaccuracy of the information, yet knowingly, willfully and maliciously communicated the falsity.

66.    As a result of the intentional communications to the third parties of the false information, Plaintiff was caused to suffer injury to her reputation in the eyes of her

community and the public at large and was forced to endure collection attempts and credit reporting of the debts that are the subject of this action, in spite of the fact that Plaintiff did not owe the debts that are the subject of this action as said accounts were fraudulently opened in her name.

67.     As a proximate consequence of said defamation, libel and slander, Plaintiff was caused to endure collection activities and harassment by CCS, to have negative credit reports, to be held up to public ridicule or shame, to have her credit limit lowered, and made to suffer humiliation, anxiety, loss of sleep, anger, fright, physical sickness, family discord, loss of enjoyment of life, and mental anguish for which she claims compensatory and punitive damages.

### COUNT THREE
**(Violation of the Fair Debt Collection Practices Act)**

68.     Plaintiff hereby adopts all of the allegations set forth in paragraphs 15 through 67 as if set forth fully herein.

69.     Within the one year prior to the filing of this lawsuit, Defendant CCS has engaged in collection activities and practices in violation of the Fair Debt Collection Practices Act with respect to the Plaintiff and an alleged consumer debt.

70.     Defendant CCS is a debt collector as that term is defined in 15 U.S.C. 1692a(6) and is regularly engaged in the collection of debts.

71.     Defendant CCS violated §1692c(a)(1) by contacting the Plaintiff at a time or place Defendant CCS knew or should have known was inconvenient to the Plaintiff.

72.     Defendant CCS violated §1692d by engaging in conduct the natural consequence of

which was to harass, oppress, or abuse the Plaintiff by repeatedly telephoning the Plaintiff with the intent to annoy, abuse, or harass the Plaintiff in an effort to coerce her into paying a debt in violation of §1692d(5).

73.    Defendant CCS violated §1692e by making false and misleading representations to the Plaintiff.  At the time Defendant CCS made these representations to the Plaintiff, Defendant CCS knew, or should have known, that said representations were false.  Said representations made by Defendant CCS were made recklessly, willfully, and/or intentionally.

74.    Defendant CCS made false representations regarding the character, amount, or legal status of the debt in violation of §1692e(2)(A).

75.    Defendant CCS communicated to a person credit information which was known, or which should have been known to be false in violation of §1692e(8).

76.    As a proximate result of Defendant CCS' actions, the Plaintiff was caused to suffer worry, humiliation, fear, loss of sleep, anxiety, nervousness, family discord, loss of enjoyment of life, physical sickness, physical pain and mental anguish for which she seeks the maximum statutory damages, actual damages, plus attorneys' fees and costs.

## <u>COUNT FOUR</u>
### (Violation of the Fair Credit Reporting Act - CCS)

77.    Plaintiff hereby adopts all of the allegations set forth in paragraphs 15 through 76 as if set forth fully herein.

78.    Defendant CCS negligently violated 15 U.S.C. §1681s-2(b)(1)(A) by failing to conduct an investigation after receiving notice that the Plaintiff disputed the information

said Defendant had provided to a consumer reporting agency.

79.    Defendant CCS negligently violated 15 U.S.C. §1681s-2(b)(1)(B) by failing to review all relevant information provided by the consumer reporting agency pursuant to §1681i.

80.    Defendant CCS negligently violated 15 U.S.C. §1681s-2(b) by failing to conduct an investigation as to the accuracy of the information reported by the Defendant to the consumer reporting agencies.

81.    Defendant CCS negligently violated 15 U.S.C. §1681s-2(b)(1)(c) by reporting inaccurate, incomplete, false, and misleading results of the investigation, if any, to the consumer reporting agencies.

82.    Defendant CCS negligently violated 15 U.S.C. §1681s-2(b)(1)(D) by failing to notify all consumer reporting agencies that the reporting of the accounts the subject of this action was inaccurate, incomplete, false, and misleading.

83.    As a result of Defendant CCS' violations set forth above, the Plaintiff suffered damage to her credit and credit reputation, her credit scores dropped significantly, her credit limit with Lowe's was reduced, and she lost credit opportunities.  Additionally, Plaintiff suffered humiliation, anxiety, loss of sleep, anger, worry, physical pain and illness, family discord, loss of enjoyment of life, and mental anguish, as well as damages for attorney fees, certified mail expenses, and other out-of-pocket losses.

## COUNT FIVE
### (Violation of the Fair Credit Reporting Act-CCS)

84.    Plaintiff hereby adopts all of the allegations set forth in paragraphs 15 through 83

as if set forth fully herein.

85.    Defendant CCS willfully violated 15 U.S.C. §1681s-2(b)(1)(A) by failing to conduct an investigation after receiving notice that the Plaintiff disputed the information said Defendant had provided to a consumer reporting agency.

86.    Defendant CCS willfully violated 15 U.S.C. §1681s-2(b)(1)(B) by failing to review all relevant information provided by the consumer reporting agency pursuant to §1681i.

87.    Defendant CCS willfully violated 15 U.S.C. §1681s-2(b) by failing to conduct an investigation as to the accuracy of the information reported by the Defendant to the consumer reporting agencies.

88.    Defendant CCS willfully violated 15 U.S.C. §1681s-2(b)(1)(c) by reporting inaccurate, incomplete, false, and misleading results of the investigation, if any, to the consumer reporting agencies.

89.    Defendant CCS willfully violated 15 U.S.C. §1681s-2(b)(1)(D) by failing to notify all consumer reporting agencies that the reporting of the accounts the subject of this action was inaccurate, incomplete, false, and misleading.

90.    As a result of Defendant CCS' violations set forth above, the Plaintiff suffered damage to her credit and credit reputation, her credit scores dropped significantly, and she lost credit opportunities.  Additionally, Plaintiff suffered humiliation, anxiety, loss of sleep, anger, worry, physical pain and illness, family discord, loss of enjoyment of life, and mental anguish, as well as damages for attorney fees, certified mail expenses, and other out-of-pocket losses.

## COUNT SIX
### (Violation of the Fair Credit Reporting Act)

91.    Plaintiff hereby adopts all of the allegations set forth in paragraphs 15 through 90 as if set forth fully herein.

92.    Equifax Information Services, LLC, and Experian Information Solutions, Inc., the entities from which Defendants obtained Plaintiff's credit reports, are consumer reporting agencies within the meaning of the Fair Credit Reporting Act.

93.    The credit reports Defendants obtained from Equifax and Experian relating to Plaintiff were "consumer reports" within the meaning of the Fair Credit Reporting Act.

94.    Under 15 U.S.C. §1681b(f), Defendants are prohibited from obtaining Plaintiff's credit reports unless Defendants have a permissible purpose for obtaining said reports.

95.    Defendants' obtainment of Plaintiff's credit reports when Plaintiff did not initiate same by way of applying for credit was a violation of 15 U.S.C. §1681b(f) as Plaintiff did not authorize Defendants to retrieve her credit report nor was a firm offer of credit made to Plaintiff.

96.    Defendants had no permissible purpose in obtaining Plaintiff's credit reports.

97.    In connection with their practices of obtaining credit reports without a permissible purpose, and specific to Defendants having obtained Plaintiff's credit reports without a permissible purpose, Defendants acted negligently.

98.    In connection with their practices, Defendants certified to Equifax and Experian that they were requesting Plaintiff's credit reports in response to a request by Plaintiff when, in actuality, said request was made without Plaintiff's permission or knowledge. Accordingly,

Defendants obtained credit reports through false pretenses within the meaning of 15 U.S.C. §1681n(b).

99.    As a result of Defendants' negligent practice of violating the Fair Credit Reporting Act, Plaintiff has been caused to suffer damage to her credit reputation and credit score, worry, humiliation, fear, loss of sleep, anxiety, nervousness, family discord, loss of enjoyment of life, physical sickness, physical pain and mental anguish for which Plaintiff seeks actual damages.

100.    As a result of Defendants' negligent practice of violating the Fair Credit Reporting Act, Defendants are liable under 15 U.S.C. §1681o for the costs of bringing this action as well as reasonable attorneys' fees.

## COUNT SEVEN
### (Violation of the Fair Credit Reporting Act)

101.    Plaintiff hereby adopts all of the allegations set forth in paragraphs 15 through 100 as if set forth fully herein.

102.    Equifax Information Services, LLC, and Experian Information Solutions, Inc., the entities from which Defendants obtained Plaintiff's credit reports, are consumer reporting agencies within the meaning of the Fair Credit Reporting Act.

103.    The credit reports Defendants obtained from Equifax and Experian relating to Plaintiff were "consumer reports" within the meaning of the Fair Credit Reporting Act.

104.    Under 15 U.S.C. §1681b(f), Defendants are prohibited from obtaining Plaintiff's credit reports unless Defendants have a permissible purpose for obtaining said reports.

105.    Defendants' obtainment of Plaintiff's credit reports when Plaintiff did not initiate

same by way of applying for credit was a violation of 15 U.S.C. §1681b(f) as Plaintiff did not authorize Defendants to retrieve her credit report nor was a firm offer of credit made to Plaintiff.

106.    Defendants had no permissible purpose in obtaining Plaintiff's credit reports.

107.    In connection with their practices of obtaining credit reports without a permissible purpose, and specific to Defendants having obtained Plaintiff's credit reports without a permissible purpose, Defendants acted willfully, knowingly, and in conscious disregard for the rights of Plaintiff under the Fair Credit Reporting Act.

108.    In connection with their practices, Defendants certified to Equifax and Experian that they were requesting Plaintiff's credit report in response to a request by Plaintiff when, in actuality, said request was made without Plaintiff's permission or knowledge. Accordingly, Defendants obtained credit reports through false pretenses within the meaning of 15 U.S.C. §1681n(b).

109.    As a result of Defendants' willful practice of violating the Fair Credit Reporting Act, Plaintiff has been caused to suffer damage to her credit reputation and credit score, worry, humiliation, fear, loss of sleep, anxiety, nervousness, family discord, loss of enjoyment of life, physical sickness, physical pain and mental anguish for which Plaintiff seeks actual damages.    Furthermore, Defendants are liable under 15 U.S.C. §1681n for punitive damages in an amount sufficient to deter Defendants from engaging in this kind of illegal practice in the future.

110.    As a result of Defendants' willful practice of violating the Fair Credit Reporting Act, Defendants are liable under 15 U.S.C. §1681n for the costs of bringing this action as well

as reasonable attorneys' fees.

## **COUNT EIGHT**
### **(Civil Conspiracy)**

111.   Plaintiff hereby adopts all of the allegations set forth in paragraphs 15 through 110 as if set forth fully herein.

112.   Defendants combined or agreed to commit the acts set forth herein.

113.   The combination or agreement of Defendants was to commit an unlawful act. Specifically, Defendants combined or agreed to harass, abuse, and coerce Plaintiff into paying a debt that it knew, or should have known, was not owed by Plaintiff. These actions include, but are not limited to, continuously ignoring Plaintiff's communications concerning the fraudulent nature of the accounts Defendants were attempting to collect, reporting fraudulent accounts to Plaintiff's credit reports in an attempt to coerce Plaintiff into paying a debt she did not rightly owe, and constantly communicating with Plaintiff in an attempt to collect an alleged debt.

114.   Defendants committed an overt act in furtherance of its agreement or combination. Defendants' overt actions include, but are not necessarily limited  to, its collection efforts and credit reporting as described herein.

115.   Due to the conduct of Defendants, Plaintiff has been caused to suffer pecuniary losses, mental anguish, worry, physical sickness and suffering, embarrassment, humiliation, and loss of enjoyment of life for which she seeks compensatory damages.

116.   Plaintiff further asserts that the actions of Defendants were willful and, therefore, Plaintiff seeks an award of punitive damages.

24

## **AMOUNT OF DAMAGES DEMANDED**

WHEREFORE, PREMISES CONSIDERED, Plaintiff demands a judgment against Defendants for the following:

A.     Judgment in favor of Plaintiff on each and every claim filed herein, to include compensatory and punitive damages;

B.     For relief in amounts or other appropriate relief as may be determined by the Court from Defendant CCS pursuant to 15 U.S.C. §1692 to include the Plaintiff's actual damages, statutory damages of One Thousand Dollars ($1,000.00), as well as attorneys' fees and costs;

C.     Actual and statutory damages from Defendants pursuant to 15 U.S.C. §1681n(a)(1)(A) and/or 15 U.S.C. §1681o(a)(1).

D.     Punitive damages from Defendants pursuant to 15 U.S.C. §1681n(a)(2);

E.     Costs and reasonable attorneys' fees from Defendants pursuant to 15 U.S.C. §1681n(a)(3) and/or 15 U.S.C. §1681o(a)(2);

F.     For compensatory and punitive damages in an amount to be determined by a struck jury for Defendants' defamation, invasion of privacy, and civil conspiracy;

G.     For this trial to be heard by a jury; and

H.     For all such other and further relief as the Court may deem just and proper.

*/s/ Penny Hays Cauley*
Penny Hays Cauley, Fed.  ID No.  10323

*/s/ William K. Geddings*
William K. Geddings, Fed.  ID No. 12584
Attorneys for Plaintiff

25

**OF COUNSEL:**
HAYS CAULEY, P.C.
1303 West Evans Street
Florence, SC 29501
(843) 665-1717
(843) 665-1718 Facsimile
phc917@hayscauley.com

**PLAINTIFF DEMANDS A TRIAL BY STRUCK JURY ON ALL COUNTS**

*/s/ Penny Hays Cauley*
Of Counsel

**DEFENDANT TO BE SERVED VIA CERTIFIED MAIL:**
(Restricted Delivery)
Comcast Corporation
c/o David Watson – President and CEO
1701 John F. Kennedy Blvd.
Philadelphia, PA 19103

Defendant Comcast Cable Communications Management, LLC
c/o CT Corporation System – Registered Agent
2 Office Park Court, Suite 103
Columbia, South Carolina 29223

(Restricted Delivery)
The CCS Companies d/b/a Credit Collection Services
c/o Steven Sands – President
725 Canton St.
Norwood, MA 02062.